RODRIGUES v. EDWARDS.

No. 246.

Circuit Court of Appeals, Second Circuit.

April 7, 1930.

David A. Buckley, Jr., of Washington, D. C. (Dean H. Stanley and Alfred C. Frodell, both of Washington, D. C., of counsel), for plaintiff.

Charles H. Tuttle, U. S. Atty., of New York City (Leon E. Spencer, of New York City, of counsel), for defendant.

Before L. HAND, SWAN, and MACK, Circuit Judges.

MACK, Circuit Judge.

This case was submitted to the District Court upon stipulated facts which may be summarized as follows: On July 2, 1918, plaintiff entered into a three-year contract of employment with the Champlain Silk Mills, to begin as of January 1, 1918. His annual compensation was thereby fixed at $3,600 plus a sum equal to 2 per cent. of the annual net profits of the silk company. It was mutually agreed that, until all the treasury common stock should be otherwise sold, the company would sell and plaintiff would buy treasury common stock with two-thirds of this 2 per cent. at book value to be determined under an agreed method, and that the company was authorized to apply the two-thirds of the 2 per cent. for that purpose. Plaintiff was given the option similarly to use the other one-third of the 2 per cent.

The company's books were to be closed and apportionments made semiannually; the loss, if any, in any year was to be charged against the profits of the succeeding year for the purpose of estimating net profits, and a final adjustment in this respect was to be made at the termination of the agreement. Plaintiff agreed that while he remained an employee he would not dispose of the stock so purchased except with the written consent of the company or of Meyer, its chief stockholder.

In the event of plaintiff's death, Meyer was to have a four-month option to purchase the shares at their then book value, on fixed terms of payment, with the right, if he exercised the option, to require an immediate assignment of the stock or trust certificates representing it. During the option period, plaintiff's stock or trust certificates were not to be sold. Meyer had the further option, at the termination of the contract, either to renew it, or, within thirty days, to offer to buy the shares or certificates as in the case of death, with a similar option, in case of renewal, at the end of the renewal period. If Meyer refused to exercise an option, plaintiff, or his representatives in the event of his death, could compel liquidation proceedings. If plaintiff refused to renew, Meyer could liquidate the corporation, or, at his option, purchase the stock. Plaintiff was further required to place the stock, immediately upon acquisition, in trust until May 1, 1921, and was to receive in return trust certificates which "shall specify upon their face that they are not assignable excepting in accordance with the terms of this agreement." The trustees were to distribute dividends on the stock

held by them to "the beneficial holder thereof."

Plaintiff received $18,393.03 as his share of the final net profits for the year 1919, $4,914.12 in cash, and the remainder, $13,478.91, in stock, all of which was included in his gross income for 1919; a tax thereon of $2,384.73 was levied and paid. A claim for the refund of that part of the tax which had been levied on income represented by the stock was rejected; thereupon plaintiff brought the present action. The applicable statutes and regulations are appended in a footnote.[1]

■ Plaintiff contends that the sum equal to two-thirds of 2 per cent. of the net profits received in stock and placed under the trust agreement was not subject in any manner to disposition by him, and therefore did not constitute any part of his income for the year 1919. Respondent urges that at the time of

acquisition the stock was something of value to which plaintiff became unconditionally entitled, that it was assignable, and that it therefore constituted income.

Plaintiff concedes that the receipt of something of exchangeable value or of which he could dispose would constitute income. See Eisner v. Macomber, 252 U. S. 189, 207, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570. He asserts, however, that under the contract he could make no disposition of the stock without the consent of the company or Meyer; furthermore, that it was subject to purchase at some future book value.

In our judgment, the contract not only did not prevent plaintiff from disposing of the trust certificates, but, on the contrary, it evidenced a clear intention that he should have a right of immediate disposition thereof. The trust certificates were to bear on their face the statement that they should not be assignable except in accordance with the terms of the agreement; this clearly implied that, subject to those terms, they might be assigned. Cf. Uniform Stock Transfer Act, § 15 (P. L. N. J. 1916, p. 402); Baumohl v. Goldstein, 95 N. J. Eq. 597, 124 A. 118. Clearly, therefore, they were not wholly inalienable, even though a prospective purchaser were to acquire them subject to the limitations under which they were held by plaintiff. The requirement of consent by a third person is not an absolute bar to negotiation (Farmers' Mercantile & Supply Co. v. Laun, 146 Wis. 252, 131 N. W. 366; In re Copal Varnish Co., [1917] 2 Ch. 349); on the contrary, it implies that, if such consent be secured, the stock or trust certificate is assignable. Some restrictions upon the transferability of corporate shares or trust certificates are now common; but such shares or certificates may nevertheless be readily marketed. See "Restrictions Upon the Transferability of Shares of Stock," 42 Harv. Law Rev. 555, and cases cited.

The express restriction against any sale was limited to the brief option periods; at other times the certificates might have been freely sold subject, of course, to the options and, during the employment, to Meyer's or the company's consent.

■ The objection that, because these shares were subject to purchase at some future book value, which theoretically might be nil, they were wholly without value, cannot be accepted. This possibility confronts the owner of any common corporate stock. The stipulated facts also contain a statement that "at the termination of the three years' agree-

---

[1] Revenue Act of 1918:

"Sec. 212. (a) That in the case of an individual the term 'net income' means the gross income as defined in section 213, less the deductions allowed by section 214." 40 Stat. 1064.

"Sec. 213. That for the purposes of this title * * * the term 'gross income'—

"(a) Includes gains, profits, and income derived from salaries, wages, or compensation for personal service * * * of whatever kind and in whatever form .paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *" 40 Stat. 1065.

Treasury Regulations 45 (1920 edition):

"Art. 53. *Income not Reduced to Possession.* —Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made. A book entry, if made, should indicate an absolute transfer from one account to another. If the income is not credited, but is set apart, such income must be unqualifiedly subject to the demand of the taxpayer. Where a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until the termination of five years of employment, the mere crediting on the books of the corporation does not constitute receipt. The distinction between receipt and accrual must be kept in mind. Income may accrue to the taxpayer and yet not be subject to his demand or capable of being drawn on or against by him."

ment, \* \* \* a final adjustment of the plaintiff's share of the two-thirds (⅔rds) of two per cent. (2%), so-called additional compensation, was made pursuant to the terms of the agreement." In the light of the contract provision that losses in any one year were to be charged against subsequent years, we assume that this means that losses, if any, were deducted after 1919. Plaintiff offered no proof that the silk company suffered any loss in 1918 which could be carried over to reduce his share of the profits in 1919, the taxable year here involved.

These conclusions are not in conflict with any of the cases cited by plaintiff or contrary to the provisions of article 53 of Regulations 45. In that article and in all of the cases, the ultimate ownership of the bonus stock depended upon the continuance of the taxpayer in the employ of the corporation for the agreed period. Appeal of James R. Lister, 3 B. T. A. 475, 482; Appeal of Roscoe H. Aldrich, 3 B. T. A. 920; cf. Kaufman Department Stores, Inc., v. Comm. (C. C. A.) 34 F.(2d) 257. Finally, plaintiff has raised no question as to the value at which the stock issued as part of his 1919 compensation should be taken, but has contested only its taxability as part of his gross income. Possibly, because of the restrictions, the value of such stock, were negotiation attempted, would be less than the price paid by plaintiff. The burden of showing this, however, was on him, and he has not met it.

Judgment affirmed.